**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JOSHUA RICH,**

**Plaintiff,**

**v.** **Civil Action No. 3:13cv137**
**(Judge Groh)**

**UNITED STATES OF AMERICA,**

**Defendant.**

# REPORT AND RECOMMENDATION

## I. Factual and Procedural History

On October 2, 2013, the plaintiff, Joshua Rich, by counsel, filed this action pursuant the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq. On December 16, 2013, the defendant filed a Motion to Dismiss, along with a Motion to Seal, together with numerous exhibits and a memorandum of law in support. On December 30, 2013, the plaintiff filed a response in opposition. On January 6, 2013, the defendant filed a Motion to Seal and for Protective Order with exhibits, along with a Reply to Plaintiff's Response to Motion to Dismiss. By separate Orders entered January 27, 2013, the defendant's Motion to Seal and Motion to Seal and for Protective Order were granted.

## II. The Pleadings

### A. The Complaint

It is undisputed that the plaintiff, a 32-year old white male inmate ("IM"), was previously incarcerated at USP Victorville ("Victorville"), in Victorville, California; USP Pollack ("Pollack"), in Pollack, Louisiana; and USP McCreary ("McCreary"), in Pine Knot, Kentucky, before arriving at USP Hazelton ("Hazelton") in Bruceton Mills, West Virginia, in February, 2011. There is also no

dispute that while at Hazelton, on August 5, 2011, the plaintiff was assaulted by a group of 5 IMs in a Special Housing Unit ("SHU") recreation "cage," and sustained serious injuries.

The plaintiff contends that on August 5, 2011, he was attacked in a Hazelton SHU recreation yard "cage" by members of the Aryan Brotherhood ("AB") a prison gang well known to the Bureau of Prisons ("BOP"), and known to the BOP as a gang from whom he should have been protected. Plaintiff avers that before arriving at Hazelton, he was repeatedly threatened by AB gang members at three prior BOP facilities, and attacked while at one, for his failure to "get in line," by joining the AB and supporting its activities. Specifically, plaintiff alleges that in November, 2008, while incarcerated at Victorville, after being threatened by the AB for failing to comply with their custom of entering and leaving common areas of the prison *en masse*; associating with non-white IMs; failing to disclose a potential money-making scheme to AB members; and refusing to fully participate in AB-arranged assaults on other IMs, he formally requested protection from the AB from the BOP's Special Investigative Services ("SIS").[1] Consequently, he contends that on November 30, 2008, an order of protection, or formal separation order, was created, directing that the plaintiff was to be protected from IM David Snow, an AB gang member who had threatened to stab him, as well as all known AB gang members and/or known members of other AB-affiliated gangs. Nonetheless, he alleges, subsequent to the entry of that protection order, the defendants failed to ensure his safety. While at Pollack, he was assaulted by two AB members.[2] Subsequently, while at USP McCreary, he became aware that the AB members "on the yard" there knew he had "checked in"[3] at Victorville.

[1] SIS acts as the prison's internal affairs, responsible for, among other things, investigating offenses committed by inmates.

[2] Plaintiff sustained a chin laceration in that attack.

[3] When an IM feels unsafe in general population because of threats, pressure, intimidation, disputes, debts, etc., and initiates contact with the Protective Custody ("PC") unit in the BOP, seeking voluntary placement in the SHU, he is said to have "checked in."

Upon discovering that there was a knife on his unit, fearful it would be used on him, he informed the SIS; ultimately he was charged with its possession and placed in the SHU for disciplinary segregation ("DS"). After arriving at Hazelton in February, 2011, he alleges that he and another IM felt so unsafe that they staged an assault on each other, in order to be placed in the SHU where they would have protection. However, upon placement in the SHU, plaintiff learned that there was known AB member there as well, an IM by the name of Tim Alexander ("Alexander").

On August 5, 2011, plaintiff was placed in a SHU recreation cage ("Rec. Cage #10"), with IM Alexander and four others, all or some of whom were allegedly known AB gang members or of AB-affiliated gangs. He was severely beaten and repeatedly stabbed, sustaining life-threatening injuries to the head, chest, back and stomach, necessitating emergency treatment, multiple hospitalizations and numerous invasive procedures and life-saving surgeries.[4]

Plaintiff's complaint alleges negligence for failure to protect. As relief, he requests a judgment against the United States; compensatory and economic damages;[5] costs, attorneys' fees, and any such other further relief as the Court deems just and proper.

**B. Defendant's Motion to Dismiss**

---

[4] Plaintiff avers that his injuries from the August 5, 2011 attack include stab wounds to the chest, back and right flank by multiple knife thrusts that penetrated his heart lungs, liver and right kidney. He was taken to Ruby Memorial Hospital ("RMH") in Morgantown, West Virginia, and later transferred to Monongalia General Hospital ("MGH"), also in Morgantown. He underwent a bronchoscopy for respiratory failure; an exploratory laparotomy to repair a liver laceration; a right nephrectomy (removal of his right kidney); a sternotomy (where the sternum is "cracked open") and open heart surgery to repair the right atrium of his heart. He avers that he still suffers from nightmares and other mental and physical *sequelae* of the attack. (Dkt.# 1 at 1-2 and 8). Plaintiff's Inmate History records, provided by the defendant, indicate that he was hospitalized at least from August 5 – 25, 2011. See Dkt.# 18-2 at 1.

[5] The plaintiff alleges that he filed an Administrative Tort Claim on November 12, 2012 which was denied on April 4, 2013. (Dkt.# 1 at 3). The complaint was filed on October 2, 2013. Although the plaintiff did not submit copies of his claim or the rejection letter, the defendant does not dispute that the plaintiff satisfied the administrative prerequisite to filing this complaint. Accordingly, the undersigned has assumed, for purposes of this Report and Recommendation that the Plaintiff properly exhausted his Administrative Tort Claim prior to filing this action.

Attached to its motion to dismiss, the defendant provides affidavits from various BOP employees; copies of plaintiff's Public Information Inmate Data; and a copy of plaintiff's Inmate History, showing his housing assignments within the BOP from August, 2008 – October, 2013.

The defendant seeks the dismissal of plaintiff's case for following reasons:

1) the discretionary function exception to the waiver of sovereign immunity under the FTCA deprives the Court of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), thus precluding the plaintiff's failure to protect claim, and

2) the plaintiff's failure to protect claim must be dismissed pursuant to Rule 12(b)(6) because the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief.

**C. Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss**

The plaintiff argues that he has stated a claim for which relief can be granted. In support, plaintiff attaches copies of BOP Program Statements 5521.05 and 5270.10, asserting that

1) the CO's obvious negligence in screening the SHU IMs for weapons and in placing him in the SHU Rec. Cage #10 renders the discretionary function exception to the FTCA inapplicable.

2) Alternatively, should the court find otherwise, plaintiff is entitled to at least limited jurisdictional discovery regarding the applicability of the discretionary function exception.

**D. Defendant's Reply to Plaintiff's Response to Motion to Dismiss**

The defendant attaches a sworn declaration from a BOP lieutenant, along with copies of various Hazelton SHU "Post Orders," and argues that:

1) only one weapon was used during the August 5, 2011 confrontation;

2) the discretionary function exception to the FTCA is applicable;

3) plaintiff's "negligent guard" theory is inapplicable; and

4) plaintiff has access to all BOP polices and program statements with the exception of the "post orders" which are provided.

5) An October, 2009 "gang sep" notation on an administrative detention order upon plaintiff's arrival at FTC Oklahoma was local to that facility and was not applicable to Hazelton.

**III. Standard of Review**

## A. Motion to Dismiss for Lack of Subject Matter Jurisdiction[6]

A party may move to dismiss an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The burden of proving subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss is on the party asserting federal jurisdiction. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). A trial court may consider evidence by affidavit, deposition, or live testimony without converting the proceeding to one for summary judgment. Id.; Mims v. Kemp, 516 F.2d 21 (4th Cir. 1975). "Unlike the procedure in a 12(b)(6) motion where there is a presumption reserving the truth finding role to the ultimate factfinder, the court in a 12(b)(1) hearing weighs the evidence to determine its jurisdiction." Adams, 697 at 1219. Further, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Materson v. Stokes, 166 F.R.D. 368, 371 (E.D. Va. 1996). Whenever it appears, by suggestion of the parties or otherwise, that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. Fed. R. Civ. P. 12(h)(3).

# IV. Analysis

## A. FTCA and West Virginia Law

The FTCA is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. § 1346(b), § 1402(b), § 2401(b), and §§ 2671-2680.

[6] Because the undersigned finds that dismissal for lack of subject matter jurisdiction is appropriate in this case, the United States' other bases for its motion to dismiss will not be discussed.

Pursuant to the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 2674 & 1346(b)(1); Medina v. United States, 259 F.23d 220, 223 (4th Cir. 2001). In West Virginia, in every action for damages resulting from injuries to the plaintiff alleged to have been inflicted by the negligence of the defendant, the plaintiff must establish three elements: (1) a duty which the defendant owes to him; (2) a negligent breach of that duty; and (3) injuries received thereby, resulting proximately from the breach of that duty. Webb v. Brown & Williamson Tobacco Co., 2 S.E.2d 898, 899 (W.Va. 1939). The burden is on the plaintiff to prove these elements by a preponderance of the evidence. Id. at 899; see also Murray v. United States, 215 F.3d 460, 463 (4th Cir. 2000). Therefore, the plaintiff must prove that the "defendant's breach of duty was more likely than not the cause of the injury." Murray at 463 (quoting Hurley v. United States, 923 F.2d 1091, 1094 (4th Cir. 1991); see also Strahin v. Cleavenger, 603 S.E.2d 197 (W.Va. 2004)(stating that "no action for negligence will lie without a duty broken."). The United States appears to acknowledge that it owes a "duty" to keep prisoners safe and free from harm. While not specifically arguing that the plaintiff failed to establish that it breached that duty and/or that it was the proximate cause of his injuries, it asserts that the plaintiff cannot prove any facts entitling him to relief, and that the discretionary function exception bars his claims.

The FTCA includes specific enumerated exceptions in 28 U.S.C. §2680. If an exception applies, the United States may not be sued, and litigation based upon an exempt claim is at an end. Smith v. United States, 507 U.S. 197 (1993); Dalehite, *supra*. Among the exceptions to the FTCA most frequently applied is the "discretionary function." The discretionary function exception precludes governmental liability for"[a]ny claim based upon ... the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee

of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984). Congress believed that imposing liability on the government for its employees' discretionary acts "would seriously handicap efficient governmental operations." Id. at 814 (internal citations and quotations omitted).

The United States Supreme Court has announced a two-step test for determining whether the discretionary function exception bars suit against the United States in a given case. First, the Court must consider the nature of the conduct and determine whether it involves "an element of judgment or choice." United States v. Gaubert, 499 U.S. 315, 322 (1991). Government conduct does not involve an element of judgment or choice and is not discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." Id. at 322 (internal citations and quotations omitted). If the conduct in question involves the exercise of judgment or choice, the second step of the analysis is to determine whether that judgment is grounded in considerations of public policy. "[T]he purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 323.

With respect to federal prisoners, the Supreme Court has determined that the duty of care owed by the BOP is fixed by 18 U.S.C. §4042, independent of an inconsistent state rule. United States v. Munitz, 280 F. Supp. 542, 546 (S.D.N.Y 1968). Title 18 U.S.C. §4042 defines the duty of care owed to a prisoner as "the exercise of ordinary diligence to keep prisoners safe and free from

harm." Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976). However, the BOP's duty towards the protection of prisoners is not the guarantee of "a risk-free environment." See Usher v. United States, 2010 WL 3721385 (E.D. Ky. Sept. 15, 2010).

In West Virginia, negligence is "always determined by assessing whether the actor exercised 'reasonable care' under the facts and circumstance of the case, with reasonable care being that level of care a person of ordinary prudence would take in like circumstances." Strahin v. Cleavenger, 603 S.E.2d 197, 205 (W.Va. 2004). "A long standing premise of the law of [West Virginia] is that negligence is the violation of the duty of care under the given circumstances. It is not absolute, but is always relative to some circumstances of time, place manner, or person." Setser v. Browning, 590 S.E.2d 697, 701 (W.Va. 2003). Accordingly, the duty of care owed to an inmate under West Virginia law is consistent with 8 U.S.C. §4042.

Although 18 U.S.C. §4042 sets forth the mandatory duty of care, it does not direct how the duty is fulfilled. See Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997)(finding the statute "sets forth no particular conduct that the BOP personnel should engage in or avoid while fulfilling their duty to protect inmates."). However, under the FTCA, in disputes between prisoners, it is clear that BOP employees could be negligent in their duty to protect prisoners if they "knew or reasonably should have known of a potential problem" between inmates. Parrott v. United States, 536 F.3d 629, 637 (7th Cir. 2008).

The United States contends that because none of the attackers were separatees of plaintiff, it cannot be liable for the plaintiff's injuries, because it had no information by which it could have known that the IMs who attacked him on August 5, 2011 created an excessive risk to his safety. (Dkt.# 13-2, ¶13 at 4). Further, it argues, BOP policy does not dictate that an IM be given an assignment of separation from an entire group or gang of IMs. (Id., ¶15 at 4). Nonetheless, the

United States avers, throughout plaintiff's BOP entire custody, whenever he requested protective custody, it was given; investigations were performed; when a verifiable threat was found, plaintiff was given separatee status from that IM. (Dkt.# 12 at 13).

The plaintiff's complaint alleges that he formally requested protection from IM David Snow, an AB gang member, the AB gang, and its affiliates, from a SIS Supervisor and/or another BOP staff member in November of 2008, and that as a result, he was placed in protective custody and a Central Inmate Monitoring System[7] ("CIM") separation order was placed, mandating that he be kept separate and apart from IM Snow and all known AB gang members and their affiliates. In response, the government provides an entirely different version of events, contending that plaintiff requested protective custody on November 18, 2008 at Victorville because he owed other IMs money and would be harmed if he did not pay. (Dkt.# 13-2, ¶6 at 2). The government neither confirms nor denies that the two IMs to whom the plaintiff owed money and sought protection from in November, 2008 were AB gang members. Nonetheless, it asserts that as a result of plaintiff's request, he was placed in protective custody in the SHU; and that after an investigation determined it to was a "verified protective custody case;" it was recommended that plaintiff remain in the SHU until he could be moved to another facility; and that he and the two IMs to whom he owed money be assigned CIM separatee status relative to each other. (Id. ¶7 at 2). The government notes that the CIM separatee assignment was only from those two IMs. (Id.). Further, the government avers that neither of these two IMs were involved in the August 5, 2011 Hazelton attack. (Id.). In response, the plaintiff provides little to rebut this; without specifically conceding or denying that the conflict *was* actually over money owed, not AB gang affiliation, he avers that the November, 2008 protection

[7] A CIMS separatee status designates "[i]nmates who may not be confined in the same institution (unless the institution has the ability to prevent any physical contact between the inmates concerned) with other specified individuals" in BOP custody. Parrot v. United States, 536 F.3d 629, 631 (7th Cir. 2008) citing 28 C.F.R §524.72(f).

order was “[d]ue at least in part” to threats from AB gang members.” (Dkt.# 14 at 2). It appears to the undersigned that because the plaintiff has not emphatically denied the government’s position that the November, 2008 dispute and alleged protective order was over money owed, rather than a personal threat over AB gang affiliation, that plaintiff’s claim he had a formal CIM separation order in place against all known AB gang members and their affiliates since November, 2008 appears to have little merit.

A careful reading of plaintiff’s complaint and response in opposition to the United States’ dispositive motion reveals that the plaintiff does not actually allege that he ever *told* Hazelton staff why he and the IM Butterfield staged their mutual assault; plaintiff only alleges that he and Butterfield were fearful when they arrived at Hazelton in February, 2011 and sought protection in the SHU. He alleges that upon arriving in Hazelton’s SHU, he realized that an AB gang member, Tim Alexander, was already there. However, again, he offers no explanation as to why he did not question why his November, 2008 CIM separatee assignment from all AB gang members would permit such a situation, or why he did not report it, if he felt endangered by IM Alexander as an AB gang member. The government’s version of the events at Hazelton preceding the deadly assault is that on June 3, 2011, the plaintiff who again attacked another IM and was placed in the SHU; on June 23, 2011, plaintiff received a CIM assignment of separation from that IM; and that that IM was not one who participated in the August 5, 2011 attack. (Dkt.# 13-2, ¶12 at 3-4). While the United States neither confirms or denies that that the plaintiff ever reported feeling endangered by AB gang members at Hazelton, the undersigned finds that if the plaintiff never disclosed to Hazelton staff why he staged the mutual assault with Butterfield, it is difficult to envision how the BOP could have known he was afraid of the AB gang.

Plaintiff's complaint further alleges that upon his arrival at Pollack in February, 2009, he realized that many members of the Texas branch of the AB gang were present there, and that within his first month there, he was assaulted by two AB gang members, receiving a chin laceration. In response, the United States contends that on March 7, 2009, it was the plaintiff who again assaulted another IM at Pollack, and subsequently received a CIM assignment of separation from that IM. (Dkt.# 13-2, ¶8 at 2-3). The government neither confirms nor denies that the IM involved in that conflict was an AB gang member. In response, the plaintiff merely reiterates his claim that despite his prior order of protection and separation status, he was "housed with and assaulted by a member(s) of the Texas AB" while at Pollack. (Dkt.# 14 at 2). Inexplicably, he again offers no explanation for why, upon his arrival at Pollack in February, 2009, when he realized how many Texas AB gang members were there, he did not question why his alleged CIM separation order from November 2008 was not in place to protect him, or report his fears to trigger an investigation and protective custody.

Plaintiff's complaint next alleges that in February, 2010, he felt threatened by AB gang members "on the yard" at USP McCreary after realizing they had discovered that he had "checked in" at Victorville. Subsequently, after learning that there was a knife on his unit, he was fearful it would be used on him. Accordingly, he informed SIS of its presence, and ended up being charged with possessing it and placed in disciplinary segregation in the SHU. The United States neither confirms nor denies this particular allegation. Instead, it contends that on February 3, 2010, plaintiff told USP McCreary staff he was having problems with members of the Texas Syndicate gang,[8] because they owed him money. (Dkt.# 13-2, ¶9 at 3). Consequently, plaintiff was placed in

[8] The Texas Syndicate is a gang that originated in the California prison system in the early 1980s, in response to other prison gangs, such as the Mexican Mafia and Aryan Brotherhood, that were attempting to prey upon native Texas inmates. It is associated with the Texas Mafia, the Dirty White Boys, and the Border Brothers, and is antagonistic to the Aryan Brotherhood, La Nuestra Familia, Mexican Mafia, Mexikanemi, and the Mandingo Warriors. See http://www.gangsorus.com/texas_syndicate.htm

*protective*, not disciplinary custody in the SHU. (Id.). However, after an investigation was unable to verify the threat, the plaintiff was placed back into general population. (Id., ¶10 at 3). In response, the plaintiff hones his allegation slightly, alleging that after he realized AB members at USP McCreary knew he had "checked in," on February 6, 2010, he "contacted BOP officials regarding this and/or other matters and informed them that he believed he would be assaulted by members of the Texas AB."[9] (Dkt.# 14 at 3). Again, he fails to explain why, upon arrival at McCreary and discovering all the AB members in the general population with him, he did not question why the November, 2008 order of protection against all AB members was not being enforced.

Finally, the plaintiff's complaint alleges that after arriving at Hazelton in February, 2011, he and another inmate, Laroy Butterfield ("Butterfield"), were so generally fearful for their own safety that they staged a mutual attack on each other in order to be placed in the SHU for protection. Plaintiff did not originally allege that this was motivated by specific fear of AB gang members. He contends that when he arrived in the SHU, he found that IM Alexander, an AB gang member, was already there. Without confirming or denying the plaintiff's claim regarding the staged mutual assault, the government describes a June 3, 2011 incident at Hazelton where the plaintiff himself who again attacked another IM and was placed in the SHU as a result. (Dkt.# 13-2, ¶11 at 3). The government provides no further information on this incident other than that plaintiff received a CIM assignment of separation from the IM he attacked, and that that IM was not one of those who attacked him on August 5, 2011. (Id., ¶12 at 3-4). In reply, the plaintiff clarifies his original claim to state that the mutual attack with Butterfield was staged to avoid "what they believed was an

[9] Inexplicably, the plaintiff attributes this statement to page 10 ("P 10") of the Declaration of Terry Stiller, the BOP Correctional Services Specialist. However, Stiller's declaration is only a 4-page document. Presumably the plaintiff intended to refer to "paragraph 10," "(¶ 10)" of Stiller's declaration. However, paragraph 10 of Stiller's declaration makes no mention of plaintiff voicing fears regarding *Texas AB gang* members while at USP McCreary, only the afore-mentioned complaint to USP McCreary staff about fears that members of *Texas Syndicate gang* (an entirely different gang) who owed him money might assault him. See Dkt.# 18, ¶10 at 3.

impending assault at the hands of the AB and/or their associates." (Dkt.# 14 at 3). The undersigned notes that once again, the plaintiff fails to offer any plausible explanation as to why he did not question why his alleged November, 2008 CIM protective order was not doing its job to keep him away from AB gang members, or why, if he were so fearful of the AB gang at Hazelton, he never notified Hazelton officials IM Alexander's status as an AB gang member in the SHU when he discovered him there, to ensure that he would be kept separate from him.

Plaintiff argues that because of his November, 2008 protective order, the United States, through the BOP, had a duty to protect him from harm from other inmates, but that BOP officials negligently breached that duty. Specifically, he alleges that the BOP failed to maintain and/or monitor the information in his CIM central file regarding his separatees, members of the AB gang or its affiliates; failed to refrain from housing him with IMs who constituted an unreasonable risk to his safety; and failed to properly screen, "wand," or search IMs entering the SHU and/or SHU recreation cages to ensure that they were not armed with weapons. Plaintiff argues that his injuries were proximately caused by the BOP's negligent actions and/or omissions.

The United States' dispositive motion concedes that plaintiff was stabbed on August 5, 2011 after being placed in the SHU recreation cage with five other IMs. The United States further notes that while plaintiff has not alleged that any of his attackers were separatees of his, none of them were his "separatees." (Dkt.# 12 at 3). While the government does not admit or deny that any of the inmates who attacked plaintiff that day were members of the AB gang, it does aver that on August 5, 2011, plaintiff had no CIM assignment of separation, separation order, order of protection or any other administrative order requiring that he be separated from members of the AB gang. (Id.). Moreover, it notes that while BOP Program Statement 5180.05, Central Inmate Monitoring System ("CIM") addresses the separation of inmates, "there is no BOP policy or procedure that mandates the

separation of an individual inmate from an entire group or gang of inmates." (Dkt.# 12 at 3). Indeed, it argues, "it is the BOP's practice not to separate an inmate from an entire group or gang unless the inmate was a member of a particular gang, and subsequently quit or "debriefed" from that gang." (Id.). It avers that procedures for searching SHU inmates are contained in "post orders;" that the post orders in place at the time of the attack mandated that SHU inmates were to be handcuffed and pat-searched before going out to recreation; and inmates were to be screened with a hand-held metal detector before entering the recreation yard and upon return. The United States contends that the COs on duty that day complied with these procedures. (Id. at 4). An examination of the "SHU REC" "post order" produced by the United States indicates that the COs cautioned that

> It is imperative that the Recreation Officer view all recreation pulls to establish an appropriate recreation cage to place each inmate. Careful review will prevent the placement of any separated inmates into the same recreational cage. Separation concerns may include individuals and/or group separations.

Dkt.# 15-3 at 2. Further, the "SHU REC" post order also required the COs to handcuff inmates from behind before the IMs exited their cells; once handcuffed, the COs were required to pat-search and screen the IMs with a hand-held metal detector "wand" before they entered the recreation yard, and again, when they returned. The COs were further required to remain in the recreation area when IMs were there and never to leave them unsupervised there. (Dkt.# 15-3). The United States also contends that while the COs' duty to search and screen for weapons was mandatory, the manner in which the searches were performed was left to their discretion. This is supported by the "SHU REC" post order, which specifically notes that

> Post orders are issued as guidelines for the officers assigned to this post and are not intended to describe in detail all of the duties assigned to this post. *Officers assigned to this post are expected to use their initiative and good judgment in all situations* covered in these post orders.

Dkt.# 15-3 at 4 (emphasis added). The United States produced affidavits from four COs on duty in the plaintiff's SHU that day; each one averred that each and every one of the "SHU REC" post-order duties were performed. (Dkt.# 18-3, 18-4, 18-5 and 18-6). By contrast, the plaintiff's complaint does not allege that he, along with the other IMs who went into the SHU recreation yard with him that day, were *not* searched; he only suggests that the search was not done "properly." Even though the record is silent as to what time of day the attack occurred; how quickly the COs intervened; or how the altercation was ultimately broken up, this is moot; plaintiff makes no allegation that the COs left him unsupervised in the SHU recreation yard or were dilatory in coming to his aid, once the attack began.

In opposition, the plaintiff argues that BOP Program Statement 5270.10, Special Housing Units, provides directives for the SHU, a "highly regulated" and "highly secure" area of the prison. Plaintiff also notes that BOP Program Statement 5521.05, Searches of Housing Units, Inmates, and Inmate Work Areas, issues a directive that inmates are to be kept safe; to that end, contraband is to be controlled and searches of inmates, housing, and work areas should be conducted, including the utilization of pat searches and metal detectors. He argues that unless discovery is permitted, he will be unable to prove his claims. Plaintiff cites to Palay v. United States, 349 F.3d 418 (7th Cir. 2003), asserting a "negligent guard" theory, in support of his argument that the discretionary function exception should not apply to divest the court of subject matter jurisdiction. He specifically denies having conceded that the SHU COs did perform the screening, searches or metal detector "wanding" of the IMs on the day of the attack. (Dkt.# 14 at 8). Rather, he asserts, it is possible that the COs did not do it at all, or did it improperly, because they were not properly trained on search technique and/or may not have known how to use metal detectors, given that a contraband weapon slipped through on the day of the attack. Finally, he argues that a "gang sep" notation by a lieutenant at FTC

Oklahoma, on an October 8, 2009 administrative detention form suggests that despite the BOP's contention otherwise, there may have been a November, 2008 separation order in place after all.

In reply, the United States reiterates its position that the plaintiff has not cited to any statute, regulation, policy, program statement or directive that would have imposed a *mandatory, non-discretionary* duty to keep the plaintiff separated from any of his August 5, 2011 attackers. The United States asserts that the fact that the attack took place in the SHU is irrelevant; the COs' discretionary duties do not become mandatory by virtue of supervising IMs in the SHU. Nonetheless, while conceding that it is possible that some negligent acts could fall outside of the FTCA's discretionary act exception, plaintiff has failed to allege facts to support a "negligent guard" theory. Finally, it notes that plaintiff's suggestion that the "gang sep" notation at FTC Oklahoma created a mandatory duty for any subsequent BOP facility to protect him from an unspecified gang has no merit. Not only is there no official BOP policy or procedure mandating that any IM be classified as "gang sep," whatever was done at FTC Oklahoma was "entirely local and internal" to that institution. (Dkt.# 16 at 12).

When a federal prisoner sues under the FTCA for injuries caused by a fellow inmate, this court and others have uniformly held the action to be barred by the discretionary function exception. See, e.g., Usry v. United States, 2013 U.S. Dist. LEXIS 41420 (N.D. W.Va. 2013) *aff'd.* Usry v. United States, 2013 U.S. App. LEXIS 22528 (4th Cir. 2013); Donaldson v. United States, 281 Fed. App'x. 75, 76-78 (3rd Cir. 2008)(upholding dismissal of an FTCA claim that federal prison employees failed to protect plaintiff from assault by a fellow prisoner on a finding that the claim was barred by the discretionary function exception); Alfrey v. United States, 276 F.3d 557, 565 (9th Cir. 2002); Cohen v. United States, 151 F.3d 1338, 1340 (11th Cir. 1998)(reversing judgment in favor of prisoner who brought an FTCA action for injuries sustained as the result of an attack by another

inmate); Dykstra v. United States Bureau of Prisons, 140 F.3d 791 (8th Cir. 1998)(discretionary function exception applied, barring suit for BOP officials' failure to warn plaintiff that his youthful appearance might make him vulnerable to attack, or to place him in protective custody when plaintiff complained that fellow inmate was staring at him); Calderon v. United States, 123 F.3d 947 (7th Cir. 1997 (discretionary function exception applied to FTCA claim for government's failure to protect plaintiff from attack by cellmate); Buchanan v. United States, 915 F.2d 969 (5th Cir. 1990) (discretionary function exception applied to FTCA claim for damages by prisoners held hostage during a prison uprising); and Graham v. United States, 2002 U.S. Dist. LEXIS 1765 (E.D. Pa. Feb. 5, 2002). The plaintiff cites to Sledge v United States, 723 F.Supp.2d 87, 93 (D.D.C. 2010), another inmate-on-inmate assault case, in support of his argument that the instant case should not be dismissed as barred by the FTCA's discretionary function exception before permitting at least "limited jurisdictional discovery," to determine if there is any evidence to show that mandatory directives exist; whether the BOP staff violated them; and whether the BOP staff exercised discretionary judgments not fraught with public policy considerations. A review of Sledge's subsequent history reveals that that case was eventually dismissed as barred by the discretionary function exception to the FTCA as well. See Sledge v. United States, 883 F.Supp.2d 71 (D.D.C. 2012) *aff'd.* Sledge v. Fed. Bureau of Prisons, 2013 U.S. App. LEXIS 25940 (D.D. Cir., Dec. 13, 2013).

Here, plaintiff's three claims of negligence against the BOP officials, for failing to maintain and/or monitor separatee information in his CIM central file regarding AB gang members or their affiliates; failing to refrain from housing him with IMs who constituted an unreasonable risk to his safety; and failing to properly screen, "wand," or search IMs entering the SHU and/or SHU recreation cages, to ensure that they were not armed, all involved "an element of judgment or

choice." Gaubert, *supra* at 322. Because federal courts have consistently held that because §4042(a) does not mandate a specific, non-discretionary course of conduct, a plaintiff must either demonstrate that other mandatory directives were violated, or that a BOP employee made a discretionary judgment not grounded in the policy of the regulatory regime, in order to establish subject matter jurisdiction. See, e.g., Calderon, 123 F.3d at 950 (holding that like §4042(a), the regulations within 28 C.F.R. §541 regarding inmate discipline and special housing units also provide general guidance to BOP employees). Because each action by the Hazelton officials involved an element of judgment or choice, the inquiry then becomes whether the challenged action was based on considerations of public policy." Id. The BOP's decision to classify the plaintiff as not having separatee status against the entire AB gang was consistent with public policy permitting the BOP to provide for the protection and safekeeping of the inmates within its care. 18 U.S.C. §§4042(a)(2) and (3). Classification and assignment decisions, as well as allocations of guards and other correctional staff fall within the discretionary exception to the FTCA. Cohen, *supra* at 1344. The BOP's decision to house the plaintiff in the SHU; permit him to recreate with other inmates; and to formulate "post orders" creating directives regarding searching SHU inmates, as well as their living and work quarters, for contraband weapons before entering and leaving the SHU, are consistent with the public policy of affording prison administrators wide-ranging deference in implementing and executing policies, because discretion is needed to preserve internal discipline and maintain institutional security. Bell v. Wolfish, 441 U.S. 520, 547 - 48 (1979). "Prison officials supervise inmates based upon security levels, available resources, classification of inmates, and other factors. These factors upon which prison officials base such decisions are inherently grounded in social, political, and economic policy." Dykstra v. United States Bureau of Prisons, 140 F.3d 791, 796 (8th Cir. 1998). Because §4042(a) "is an established governmental policy . . . [that] allows a Government agent to

exercise discretion" in providing for the safekeeping, protection, and care of inmates, it must be "presumed that the [BOP's] acts are grounded in policy when exercising that discretion." Gaubert, *supra* at 324.

Here, because the plaintiff has offered little or nothing to refute the United States' arguments or the evidence used to support them, he has failed to show that there was a mandatory directive that was violated. His claim that there was a November 2008 CIM separation order in place, alerting the Hazelton staff of the risk the AB gang posed to his safety is less than convincing, given his apparent failure to protest its non-enforcements at subsequent BOP facilities. Likewise, his contentions regarding alleged incidents of conflicts with AB gang members at prior institutions lack merit. Finally, while there is no evidence here to support such a finding, even assuming that the COs on duty in the SHU on the day of the attack were negligent in performing their pat-searches and screenings, the discretionary function exception would still apply. See Hylin v. United States, 755 F.2d 551, 553 (7th Cir. 1985) ("Whether the government was in fact negligent is irrelevant to the analysis.").

Accordingly, the undersigned finds that the BOP's decisions to not create a CIM separatee status to keep the plaintiff away from all AB gang members or their affiliates; to place him in the SHU recreation yard with the inmates who ultimately attacked him; and to search or screen inmates for contraband before they entered and left the SHU for recreation, are the kind of conduct that the discretionary function exception was intended to protect. While the undersigned finds that the brutal attack on plaintiff was tragic and regrettable, the plaintiff has produced no evidence to show that the BOP staff violated any prescribed mandatory duty. Thus, the undersigned finds that this court lacks subject matter jurisdiction to consider his claims.

## V. Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that the defendant's Motion to Dismiss (Dkt.# 12) be GRANTED and the plaintiff's Complaint be DISMISSED with prejudice.

Within **fourteen (14) days** after being served with a copy of this recommendation, **or by May 27, 2014**, any party may file with the Clerk of the Court written objections identifying the portions of the recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985) Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied,* 467 U.S. 1208 (1984).

The Clerk of Court is directed to provide a copy of this Report and Recommendation to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Filing in the United States District Court.

Dated: May 13, 2014

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE